UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

BYRON A. BRADFORD,                                                        Plaintiff,

v.                                                    Civil Action No. 3:11-cv-P488-DJH

KAREN OWENS *et al.*,                                                  Defendants.

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiff Byron Bradford is a Kentucky state correctional facility inmate.  Bradford injured his leg while playing basketball in the facility.  He claims that corrections officials and medical staff were deliberately indifferent to his medical needs following his injury, failed to properly treat him, and retaliated against him when he complained of mistreatment.  Before the Court is a renewed motion for summary judgment by Defendants Doug Crall, M.D., and Rhonda Coleman (the Kentucky Department of Corrections (KDOC) Defendants) (DN 162); a renewed motion for summary judgment by Defendant Correctcare-Integrated Health, Inc., and Defendant Nurses Karen Owens, James McCoy, Marcia Shrock, and Kristy Mullins (the Correctcare Defendants) (DN 186); and several related motions.  For the following reasons, both the KDOC and Correctcare Defendants' renewed motions for summary judgment will be granted in part and denied in part.

## I. INTRODUCTION

Plaintiff ruptured his left Achilles tendon on July 29, 2010, while playing basketball at Luther Luckett Correctional Complex (LLCC), the institution where he is incarcerated.  Plaintiff claims that he was denied adequate medical care after he reported his injury to the medical staff at LLCC and did not receive surgery for this injury until November 19, 2010.  Plaintiff claims that because medical staff failed to assess the seriousness of his condition, his treatment was

delayed, and he has a permanent injury which causes him to suffer from a weak and unstable left leg and an inability to participate in any sport activity.  Plaintiff further claims that certain Defendants retaliated against him for filing grievances and open records request related to his medical treatment by issuing disciplinary write-ups against him, placing him in the Special Management Unit (SMU) at LLCC, and transferring him to another facility.  Plaintiff also claims that after he re-tore his Achilles tendon, certain medical staff failed to provide him appropriate medical care and continued to retaliate against him.  Finally, Plaintiff claims that certain Defendants conspired against him to deprive him of appropriate medical care.

## II. PROCEDURAL HISTORY

On August 30, 2011, Plaintiff, who is proceeding *in forma pauperis*, filed the instant 42 U.S.C. § 1983 action.  During the time period relevant to this action, Plaintiff was incarcerated at LLCC or Kentucky State Reformatory (KSR).  During this same period, Defendant Doug Crall, M.D., was the KDOC Medical Director and Defendant Rhonda Coleman was assigned to the LLCC medical department.  Defendant Correctcare-Integrated Health, Inc., (Correctcare) was the private healthcare provider contracted by KDOC to provide medical services to the prison population.  Defendants Karen Owens, LPN; James McCoy, RN; Marcia Shrock, APRN; and Kristy Mullins, LPN, were employed by Correctcare to work in the LLCC medical department during the time period relevant to Plaintiff's claims.

On December 20, 2011, the Court conducted an initial review of Plaintiff's complaint pursuant to 28 U.S.C. § 1915A and allowed his claims of deliberate indifference to a serious medical need to proceed against McCoy, Owens, Shrock, Dr. Crall, and Correctcare, and his claims of retaliation to proceed against Mullins, Shrock, and Coleman (DN 7).  Plaintiff then

2

filed an amended complaint (DN 94) against Owens, Shrock, and Coleman for conspiracy to implement a plan to deprive him of his Eighth Amendment rights and a supplemental complaint (DN 94-1) alleging that "Defendants" continued to provide him with unconstitutional treatment and retaliate against him.

All remaining Defendants have now moved for summary judgment (DNs 162 & 186). On July 16, 2016, Plaintiff filed a motion for an extension of time to file his response to these motions for summary judgment (DN 191), and on July 25, 2016, Plaintiff filed a motion for leave to exceed the response memorandum page limit (DN 194). On August 8, 2016, the Correctcare Defendants filed a motion to exceed the reply memorandum page limit (DN 195). On August 19, 2016, Plaintiff filed a motion for leave to file a sur-reply (DN 197). Upon review, the Court will grant each of these motions. On August 22, 2016, Plaintiff filed a motion to strike the KDOC Defendants' reply to his response to their motion for summary judgment, because, according to Plaintiff, it was untimely (DN 199). The Court will deny this motion.

### III. FACTS

### A. The Sick Call Process at LLCC

Non-Defendant Dr. Frederick Kemen, the Regional Medical Director for Correctcare, and the administrator of the LLCC medical department, provided an affidavit regarding the sick call process at LLCC. (DN 186-9, Kemen Aff.) According to Dr. Kemen, when inmates at LLCC submit sick call slips to the LLCC medical department, the inmates are typically triaged by either a registered nurse or a licensed practical nurse. When these nurses triage patients during sick call, they follow guidelines contained in "medical standing orders," which provide assessment and treatment protocols for common ailments and injuries. The basic premise of the medical

standing orders is to allow nurses to provide effective treatment for the most common sick call issues without involving a medical doctor or nurse practitioner.  If the inmate is compliant with the course of treatment prescribed by the standing orders and returns to sick call complaining that his condition does not improve, the Nurse Service Administrator is notified and determines whether the inmate needs to see an outside medical provider.  Once Correctcare approves requests for outside treatment, administrative staff must schedule appointments with providers, taking into account the urgency of the request and the available times allotted to KDOC officers to transport the inmate to the outside provider.

According to LLCC Policy and Procedures, "Healthcare staff shall follow the written standing orders."  (DN 192-4, p. 1, LLCC Policies and Procedures, LLCC 13-02-01(A)(1)).  In addition, the Kentucky Corrections Health Care Services Protocol provides that the Kentucky Correctional Health Care Health Services program "shall be designed to provide inmates with the ability to have unimpeded access to health services to meet their serious medical, dental, and mental health needs."  (DN 192-5, p. 1, Kentucky Corrections Health Care Services Protocol, KCHC-A-01).  This same Protocol also states that "[d]uring incarceration, inmates shall be entitled to responsive, clinically appropriate, and timely diagnosis, treatment, and care of health problems."  (DN 192-5, p. 3, KCHC-A-09).

### B. Chronology of Medical Events

According to Plaintiff's medical records, he injured his Achilles tendon while playing basketball at LLCC on July 29, 2010.  He submitted a sick call slip regarding this injury on August 2, 2010.  This sick call slip stated: "I believe my achilles tendon (left foot) is either torn or severely strained and is possibly hemorrhaging.  Foot is slightly discolored and swollen."

(DN 186-8, KDOC Medical Records, p. 1).  Defendant Nurse McCoy examined Plaintiff on

August 4, 2010.  McCoy made the following notes regarding this examination:

> IM report . . .  left foot pain in the Achilles tendon area x 5-6 days.  IM states he
> was playing basketball and went up for a rebound and heard a very loud pop.  IM
> states that the area has become painful, swollen and discolored.  IM states that
> pain level is 0/10 while seated, 4/10 when walking if he favors the injured side,
> 10/10 if he tries to 'push off' with toes of left foot.

(DN 186-8, KDOC Medical Records, p. 5).

 In the assessment section of his notes, McCoy wrote as follows: "left foot: moderate

edema on medial side of ankle extending rearward to Achilles tendon, . . . scant ecchymosis . . .

no ROM limitations: IM noted to be walking with slight limp." (*Id.* at p. 5).  The record further

reflects that McCoy told Plaintiff to rest his ankle, apply ice while awake, compress his left ankle

with an Ace wrap, and elevate his leg to heart-level as much as possible when swelling is

present.  McCoy also prescribed Plaintiff 600 mg Ibuprofen for five days and advised Plaintiff to

return to sick call "if no improvement or increase in pain." (*Id.*).  McCoy also offered Plaintiff

crutches and "gym restrictions," but Plaintiff stated that they were "not needed." (*Id.* at p. 10).

In treating Plaintiff, McCoy followed LLCC's "standing orders" for suspected sprains and

strains.  (DN 186-3, Answer, Interrog. No. 8).

LLCC's "standing order" for suspected sprains or strains indicates that the objective

symptoms of a sprain or strain are "tenderness, ecchymosis, pain with stressing joint, decreased

ROM due to pain and swelling, soft tissue swelling . . . ." (DN 192-1, LLCC Standing Orders,

p. 7).  It then provides the following instructions for treatment or "intervention": "rest; ice or

cool compress q. 1 hr. while awake x 72 hrs.; compress w/ Ace wrap w/instructions for use;

elevate leg to level of heart as much as possible if swelling is present – instruct pt. to expect

ecchymosis and bruising; . . . lower extremity pain: crutches for 48-72 hours if weight bearing is

painful…Depending on severity: 1. Tylenol 2 TID prn X 7 days with food; or 2. Motrin 600 mg

one TID prn X 7 days with food." (*Id.*). Finally, the standing order calls for the triage nurse to

"refer to provider for: 1. Unstable joint; 2. Suspected fracture; 3. Crepitus to palpation or sounds;

4. gross swelling; 5. Severe pain; 6. Ecchymosis, focal or severe tenderness." (*Id.*).

On August 10, 2010, Plaintiff completed another sick call slip. He stated as follows: "I

was seen by [Defendant Nurse] McCoy for an injury to my Achilles tendon. Since that time, I

have experienced symptoms which seem to indicate that the injury is worse than initially

thought, e.g., increased difficulty walking and a feeling that I am standing on bone when

barefoot." (DN 186-8, KDOC Medical Records, p. 11). Plaintiff was seen by Defendant Nurse

Owens on August 11, 2010. Her assessment of Plaintiff's injury was as follows: "ROM: good to

affected l. foot. IM able to move up/down, left/right with NAD, Pedal pushes: strong, equal, 0

facial grimacing noted. Pain: 0/10 sitting. 6/10 with motion. Pedal Pushes: strong, palpable."

(*Id.* at p. 12). This record also reflects that Plaintiff told McCoy that he "had not been taking an

Ibuprofen (as recommended) d/t minimal pain." (*Id.* at p. 13). Owens then advised Plaintiff to

follow the regimen prescribed by Defendant Nurse McCoy. (*Id.*) Owens also offered Plaintiff a

walking cane for support, but Plaintiff stated that he did not need one at that time. In the

recommendations section of this record, Owens wrote: "Forwarding to clinic nurse with possible

f/u with Medical Provider to determine need for further diagnostic review." (*Id.*).

On September 13, 2010, Plaintiff filed his first grievance regarding the medical care he

was receiving for his injury. (DN 1-1, pp. 4-6). In this grievance, Plaintiff explained that he first

received an evaluation for his injury by McCoy on August 4, 2010, and a subsequent evaluation

by Owens on August 11, 2010, and that he feared these evaluations were inadequate.  (*Id.*).  In

the grievance, Plaintiff specifically requested an x-ray or MRI to determine the extent of his

injury.  (*Id.*).

On September 16, 2010, Plaintiff was seen by Defendant Nurse Shrock.  The reason for

the consultation was explained as follows:

> IM states that on 7/29/10, IM was playing basketball when he heard a loud 'pop'
> at the Achilles site . . . .  He states that his ankle swelled and he could not put any
> pressure on the ball of his foot.  He states that he now compensates for the injury
> & it puts more strain on his hips & back.  He was been wearing an ankle brace &
> putting ice on the site in the evenings, visible & palpable indention at L Achilles
> + plantar flexion.

(DN 186-8, KDOC Medical Records, p. 15).  Based on this information, Shrock assessed

Plaintiff to have an "achilles rupture" and requested a left foot x-ray "to rule out an avulsion

fracture at the tendon insertion site" and an MRI.  (*Id*. at p. 16).

On September 23, 2010, Plaintiff received an x-ray.  This x-ray showed no fracture or

dislocation and that Plaintiff's left foot was "intact, free of trauma, or other abnormality."  (*Id*. at

p. 19).  On this same date, Correctcare authorized an MRI for Plaintiff to be scheduled between

"9/23/10-11/22/10."  (*Id*. at p. 20).

On October 1, 2010, Plaintiff filed his second grievance.  (DN 1-1, pp. 7-9).  In this

grievance, he stated that although he had still not received a diagnosis, he believed that he had

been suffering from an injury to his left Achilles tendon for the "last two months."  (*Id*. at p. 8).

He further stated that he had "repeatedly made known to medical staff, specifically, [Defendant

Nurse] McCoy; [Defendant Nurse] Owens; and [Defendant Nurse] Shrock that he was concerned

about the loud 'pop' that occurred at the time of his injury, his continued inability to put pressure

7

on the ball of his foot (to this very day); [and] the indentation where a portion of the tendon should be . . . ."  (*Id.*).  In the "informal resolution" section of this grievance, Shrock noted that an MRI had been scheduled for the following week.  (*Id.*).  Plaintiff appealed this decision because he believed he had a "serious health concern" which "should be treated immediately, not 'next week.'"  (*Id.* at p. 10).  On October 12, 2010, the Healthcare Grievance Committee issued "Findings and Recommendations," which stated that the Committee agreed with the informal resolution.  (*Id.* at p. 11).

Plaintiff's medical records reflect that he received an MRI at Baptist Hospital Northeast on October 12, 2010.  The MRI showed that Plaintiff had a "complete mid-Achilles tendon rupture."  (DN 186-8, KDOC Medical Records, p. 25).  The records then show that Shrock requested an "ortho consultation" for Plaintiff on October 18, 2010.  (*Id.* at p. 26).  This request was faxed to Correctcare on October 29, 2010.  Instead of approving the request, Correctcare requested more clinical information stating: "Is he ambulatory?  What is his gait?  Can he walk on his toes?  Where is his pain?"  (*Id.* at p. 30).

On October 26, 2010, Plaintiff appealed the October 12, 2010, decision of the Healthcare Grievance Committee, stating that although he had received an MRI, it has been "over three weeks" and he still had not received any information regarding his diagnosis.

On November 5, 2010, Shrock responded to Correctcare's request for more information. She wrote: "Pt is ambulatory with a cane only, he cannot weight bear, he can only walk on toes, pain is in L heel/foot, It has become increasingly difficult to ambulate.  IM states 'feels like standing on bone when barefoot.'"  (DN 186-12, Correctcare Authorization Request, p. 4). Based on this information, a second request for authorization for an "ortho consult" was returned

8

from Correctcare with requests for still more information.  The form stated: "MRI results are inconsistent w/ pts symptoms.  Need more information re: how pt. is ambulating.  Ability to walk on toes is inconsistent w/ an Achilles tendon rupture.  Perhaps observation of IM's ambulation when he is unware he is being watched."  (DN 186-8, KDOC Medical Records, p. 32).  On November 8, 2010, this additional information was submitted to Correctcare by Shrock: "Inmate was brought to exam room today.  He was observed walking without cane.  He ambulates R heel-toe, L heel, R heel-toe.  He states he cannot walk for long periods of time.  He cannot bear any weight on ball of L foot."  (*Id.*)

On November 9, 2010, Correctcare approved Shrock's request for an "ortho consult."  The consult was to be scheduled between October 29, 2010, and December 28, 2010.  On November 18, 2010, an LLCC official called the office of an orthopedic surgeon named Dr. Jacob to schedule an appointment.  (*Id*. at p. 39).  On that same date, Dr. Jacob requested Plaintiff's "Ct results," and an LLCC official faxed them to his office.  Dr. Jacob's office then called LLCC back and said they needed to see Plaintiff "today" and that his surgery should be scheduled for "tomorrow."  (*Id*. at p. 40).

On November 18, 2010, Shrock faxed another authorization request to Correctcare captioned "Providers Request Consultation (Achilles tend sx-URGENT)."  (*Id*. at p. 45).  It then stated: "per Dr. Jacob's recommendations, wants to perform surgery on 11-19-10."  This request was approved by Correctcare, and Dr. Jacob performed surgery on November 19, 2010, to repair Plaintiff's Achilles tendon.

On November 21, 2010, Defendant Nurse Mullins ordered Plaintiff to have a bottom bunk on the bottom floor and gym restrictions for six weeks.  (DN 186-8, KDOC Medical

Records, p. 50).  On November 24, 2010, Owens noted that Plaintiff could have crutches in his cell for six days and that he must be brought to medical twice a day for treatment.  (*Id.* at p. 51).

On February 28, 2011, Plaintiff filed a grievance in which he stated that he had discovered that there was a "false entry in [his] medical records which appears to have a direct impact on the timeless of diagnosis and treatment of the injury to [his] left Achilles Tendon." (DN 162-1).  In this grievance, Plaintiff specifically referenced Owens' notations from August 11, 2010, that his "pedal pushes" were "strong, equal" and "palpable."  (*Id.*)  Plaintiff specifically requested that his "medical records [be] corrected."  (*Id.* at p. 3)  The Healthcare Grievance Committee reviewed Plaintiff's grievance and determined that Plaintiff's medical records would not be altered.  (*Id.* at p. 7).  Plaintiff appealed this decision to Defendant Dr. Crall, the KDOC Medical Director, who affirmed the findings of the Healthcare Grievance Committee.  (*Id.* at p. 15)

On March 2, 2011, Shrock requested another consultation for Plaintiff with Dr. Jacob for "f/u cast removal / eval due 10 weeks ASAP."  (*Id.* at p. 63).  Plaintiff was seen by Dr. Jacob on that same day.  Dr. Jacob's notes from his examination of Plaintiff are as follows:

> DIAGNOSIS: Status post left Achilles tendon repair with allograft.  HISTORY: A 44-year-old inmate is now approximately 10 weeks out from the above stated injury.  The patient was to be seen back in January and presents today in his cast. Again, he has been in a short leg cast with foot plantar flexed since his last visit on December 6.  PHYSICAL EXAMINATION: Cast was removed today.  His wound is completely benign.  He does have active range of motion of the ankle which is good, but he is not ready to start weight-bearing.  I removed the cast.  I placed him in a temporary posterior splint.  PLAN:  The facility needs to place him into a fracture boot that he can remove to begin active range of motion exercises of the ankle.  He needs daily physical therapy or at least 3 days a week for heat, e-stim and active assisted range of motion.  Return to see me in 4 weeks. Will then allow weight bearing in the fracture boot.  No x-rays necessary.

(*Id*. at p. 64).

Plaintiff was then transferred to KSR on March 15, 2011.  (*Id*. at p. 74).  A non-Defendant nurse at KSR ordered that Plaintiff be given a bottom bunk on the bottom floor and a wheelchair for one month or "until seen by provider."  (*Id*. at p. 73).  Plaintiff was discharged from KSR on April 14, 2011.  A medical record from April 14, 2011, captioned "Physical Therapy: Update" states: "Inmate was seen on a day trip from LLCC on 3/8/2011 and was able to demonstrate that he could perform his exercise program very well and did not need ongoing physical therapy.  He was put on a turnaround transfer to KSR for one month.  He was monitored by PT but did not need PT as he continued to do well with his home exercise program. . . .  He does not need to be at KSR and can return to LLCC."  (*Id*. at p. 78).

On March 18, 2011, Plaintiff drafted a letter regarding his transfer which stated that he believed he had been transferred to KSR by either Coleman and/or Shrock in retaliation for his "vigorous advocacy to obtain surgery which would not have otherwise occurred, and pursuit of vindication of his rights."  (DN 1-1, pp. 80-81).  He stated that on February 22, 2011, he had sent a letter to the medical department specifically requesting that he be consulted prior to any transfer to KSR since he had the right to refuse treatment - specifically, physical therapy for his surgically repaired Achilles tendon.  He stated that he did not want to be transferred because he wanted to complete the sex offender treatment program he was enrolled in at LLCC and that the physical therapist at KSR had agreed that he did not need to be transferred to KSR for physical therapy because she had given him exercises he could do on his own.  A deputy warden responded to Plaintiff's letter stating that "when a doctor issues medical orders for treatment and/or therapy, the medical staff is obligated to carry through with that order."  (*Id.* at p. 82).

11

On June 22, 2011, Plaintiff was again seen by Dr. Jacob, approximately eight months after his surgery.  Following this appointment, Dr. Jacob noted as follows:

> He is doing well.  He has regained just about full range of motion of the ankle. He does have a little tenderness over the repair site but that is not unusual, having a little bit of plantar fasciitis.  So, he needs to get started on a nonsteroidal anti-inflammatory. . . .  Continue strengthening exercises.  He does not need his fracture boot, but no sport activity.  PLAN : Return to see me in 2 months for probable final follow up.

(DN 186-8, KDOC Medical Records, p. 84).  Plaintiff was seen by Dr. Jacob again on August 24, 2011, and again Dr. Jacob noted that Plaintiff was "doing well."  (*Id.* at p. 85).

On November 27, 2011, Plaintiff submitted a sick call request on which he wrote as follows:

> Over one year following surgery to repair a ruptured Achilles tendon I still cannot support the weight of my body on the ball and toes of the injured foot; I therefore cannot descend from the top bunk using the ladder.  Instead, I have been forced to jump on the stool or the floor.  I believe I have strained the repaired tendon.  I also want to know what can be done to allow me to be able to regain full function of the repaired tendon as I was told by Dr. Jacob . . . Requested follow up with surgeon and new MRI.

(*Id.* at p. 86).  Based upon this sick call request, on November 29, 2011, Shrock requested a consultation with Dr. Jacob and an MRI for Plaintiff.  This request was submitted to Correctcare on December 2, 2011.  Correctcare ordered that the request be resubmitted after Plaintiff's parole hearing which was scheduled for December 11, 2011.  (*Id.* at 91).  Plaintiff was not paroled.

Consequently, on January 4, 2012, Correctcare approved the request for another MRI, and it was conducted on January 27, 2012.  (*Id.* at 96).  The findings from this MRI were as follows: "IMPRESSION: Findings are consistent with a retear of the Achilles tendon over 8 cm

length.  The tear itself involves 30-40% of the thickness of the tendon in posterior fibers."  (*Id*. at p. 96).

On January 30, 2012, Shrock ordered that Plaintiff be given a boot and  bottom bunk for six months due to an "Achilles tendon retear."  (*Id*. at p. 98).

### C. Plaintiff's Disciplinary Write-Ups and the SMU

On November 23, 2010, Mullins issued Plaintiff a disciplinary write-up for using a wheelchair because she believed it was in contravention of an order issued by Shrock that Plaintiff should not have a wheelchair.  (DN 192-15).  The investigating officer found that a correctional officer had retrieved a wheelchair for Plaintiff to use "to go to medical and to receive his morning shot" and then told another inmate to wheel Plaintiff to medical.  (*Id*. at p. 2).  The correctional officer told the investigating officer that he "was advised by the compound supervisor to due [sic] to so because of the snow and ice on the ground."  (*Id.*).  The investigating officer determined that the write-up should be dismissed since "it was security staff that went and got the wheelchair and not the inmate."  (*Id.*).

On November 24, 2010, Mullins issued Plaintiff a disciplinary write-up "for failing to appear at a medical appointment."  (*Id*. at p. 3).  She reported that she had received a call from a correctional officer stating that Plaintiff "was hurt and broken and if we wanted him to come to medical then we would have to come to the dorm with a wheelchair and pick him up."  (*Id.*).  Both parties agree that this write-up was also subsequently dismissed.

However, on this same day, Shrock requested that Plaintiff "be placed in the SMU at LLCC."  Shrock contends that she did this for Plaintiff's "continuity of medical care."  (DN 192-2, p. 1).  In Plaintiff's declaration, he states that upon being placed in the SMU, "[I was] locked

up in an observation cell.  I was forced to crutch to medical for my injections.  I was secured in a

waist belt, chains, and handcuffs attached to each wrist and each crutch.  I was forced to crutch

in this manner for my medications the entire time I was in the observation cell, save for one

occasion."  (DN 192-8, ¶ 9).

On February 28, 2011, Plaintiff filed a "report" stating that Mullins had taken his

wheelchair even though Shrock had issued him a wheelchair to use during inclement weather on

January 11, 2011.  (DN 192-21).  In this report, Plaintiff further stated that Mullins had also filed

two disciplinary reports against him - one for stealing a wheelchair and one for failure to report

for treatment.  Plaintiff stated that, with regard to the latter report, he did not refuse treatment but

simply could not make the trip to medical because he "was on crutches, had blisters on [his]

hands, and it was pouring rain."  (*Id*.).

## IV. LEGAL STANDARD

Before the Court may grant a motion for summary judgment, it must find that there is no

genuine dispute as to any material fact and that the moving party is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the

basis for its motion and identifying that portion of the record that demonstrates the absence of a

genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the

moving party satisfies this burden, the non-moving party thereafter must produce specific facts

demonstrating a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986).

The evidence of the non-moving party is to be believed, *Anderson*, 477 U.S. at 255, and

all reasonable inferences that may be drawn from the facts placed before the Court must be

drawn in favor of the opposing party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Nevertheless, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Id.* at 586. Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. It is against this standard that the Court reviews the facts presented.

## V. ANALYSIS

Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). Two elements are required to state a claim under § 1983. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "A plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "Absent either element, a section 1983 claim will not lie." *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991).

### A. Deliberate Indifference to a Serious Medical Need

The Eighth Amendment protects convicted prisoners from the "unnecessary and wanton infliction of pain." U.S. Const. amend. VIII. An Eighth Amendment claim requires a plaintiff to prove two distinct components - one objective and one subjective. First, the alleged deprivation

15

must be, objectively, "sufficiently serious," *i.e.*, the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1970) (citations and internal quotation marks omitted). Second, the official must have been "deliberately indifferent" to the inmate's health or safety. *Id.*

## 1. Serious Medical Need

To satisfy the objective component of an Eighth Amendment deliberate indifference claim, Plaintiff must show the existence of a sufficiently serious medical need, meaning that he is "incarcerated under conditions posing a substantial risk of serious harm." *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 834).

Courts have generally agreed that a ruptured Achilles tendon is a serious medical need. *See, e.g.*, *Hemmings v. Gorczyk*, 134 F.3d 104, 109 (2d Cir. 1998) (ruptured Achilles tendon constitutes a serious medical need); *Gibbons v. Montgomery Cty.*, No. 1601233, 2016 U.S. Dist. LEXIS 92793, at *12 (E.D. Pa. July 18, 2016); *Zeigler v. PHS Corr. Health Care, Inc.*, No. 11-203Erie, 2012 U.S. Dist. LEXIS 76377, at *10-12 (W.D. Pa. June 1, 2012); *Turner v. Kirsch*, No. 08-2005, 2011 U.S. Dist. LEXIS 40517, at *15 (E.D. Pa. Apr. 13, 2011) ("[W]e have no difficulty concluding that Plaintiff's injury [a torn Achilles tendon] is sufficiently severe to allow a reasonable jury to conclude that he had a serious medical need."); *Taylor v. Plousis*, 101 F. Supp. 2d 255, 262 (D.N.J. 2000) (a medical condition "which threatens a plaintiff's ability to walk, even on a non-permanent basis, falls within the ambit of a serious medical need").

Thus, despite Defendants' argument to the contrary, the Court concludes that Plaintiff has established that he suffered from a serious medical need.

## 2. Deliberate Indifference

The subjective component of the Eighth Amendment standard is met "where a plaintiff

demonstrates that prison officials acted with 'deliberate indifference' to a serious medical need,"

which "is the equivalent of 'recklessly disregarding that risk.'"  *McCarthy v. Place*, 313 F.

App'x 810, 814 (6th Cir. 2008) (quoting *Farmer*, 511 U.S. at 836).  In other words, "[s]atisfying

the objective component ensures that the alleged deprivation is sufficiently severe, while

satisfying the subjective component 'ensures that the defendant prison official acted with a

sufficiently culpable state of mind.'"  *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir.

2013) (quoting *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003)).  Under the subjective

prong, a plaintiff must show: (1) "the official being sued subjectively perceived facts from which

to infer substantial risk to the prisoner"; (2) the official "did in fact draw the inference"; and

(3) the official "then disregarded that risk."  *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th

Cir. 2014).

In addition, in *Alspaugh v. McConnell*, the Sixth Circuit held as follows:

"[W]e distinguish between cases where the complaint alleges a complete denial of
medical care and those cases where the claim is that a prisoner received
inadequate medical treatment."  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th
Cir. 1976).  Where a prisoner alleges only that the medical care he received was
inadequate, "federal courts are generally reluctant to second guess medical
judgments."  *Id*.  However, it is possible for medical treatment to be "so woefully
inadequate as to amount to no treatment at all."  *Id*.

643 F.3d 162, 169 (6th Cir. 2011).

The Sixth Circuit has also held that "[a] plaintiff alleging deliberate indifference must

show more than negligence or misdiagnosis of an ailment."  *Johnson v. Karnes*, 398 F.3d 868,

874 (6th Cir. 2005).  A plaintiff must also show that his claim involves more than a difference of

17

opinion between the plaintiff and a doctor regarding the plaintiff's diagnosis and treatment. *Westlake v. Lucas*, 537 F.2d at 860, n.5.  In other words, the mere malpractice of medicine in prison does not amount to an Eighth Amendment violation, s*ee Estellle v. Gamble*, 429 U.S. 97, 104 (1976), and "this principle may cover a delay in treatment based on a bad diagnosis . . . ." *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000).

### a. Defendant Nurse McCoy

The Correctcare Defendants first argue that Defendant Nurse McCoy is entitled to summary judgment because his "misdiagnosis" of Plaintiff's injury does not constitute deliberate indifference.  In his sur-reply, Plaintiff explicitly states that he is not claiming that McCoy is liable for failing to properly "diagnose" or treat his ruptured Achilles tendon because he knows that McCoy is not qualified "to either diagnose an injury or illness, … nor opine on a course of treatment for an Achilles tendon rupture" and that McCoy would be entitled to summary judgment if this was his claim.  (DN 197, Pl. Sur-Reply, p. 2).  Rather, Plaintiff argues that McCoy is liable for violating the "simplest of constitutional requirements as it relates to medical care,"- the duty of a "triage nurse" to refer an inmate to a medical provider for a serious medical condition.  In support of his position, Plaintiff cites to two district court cases which both state as follows: "[A] LPN is not authorized to make a diagnosis.  However, a LPN, and especially a LPN who is the sole gatekeeper for access to a physician, must be able to know when there is a risk of a serious health condition that requires additional care."  *Jimenez v. Hopkins Cty.*, No. 4:11-CV-00033-JHM, 2014 U.S. Dist. LEXIS 3722, at *24 (W.D. Ky. Jan. 13, 2014);[1] *Rodrigue*

---

[1] This case was actually reversed and remanded by the Sixth Circuit in *Shadrick v. Hopkins Cty.*, 805 F.3d 724 (6th Cir. 2015), but not for the proposition cited by Plaintiff.

*v. Morehouse Det. Ctr.*, No. 09-985, 2012 U.S. Dist. LEXIS 141007, at *15 (W.D. La. Sept. 28, 2012).

Both *Jimenez* and *Rodrigue*, however, are easily distinguishable from the case at bar. First, both *Jimenez* and *Rodrigue* involved inmates who presented to the defendant nurse with what the court in *Rodrigue* characterized as "emergency" requests. 2012 U.S. Dist. LEXIS 141007, at *14. For example, in *Rodrigue*, the inmate plaintiff had complained to the defendant nurse on four occasions within one week that he had "persistent extreme abdominal pain and bilious vomiting" which did not improve despite the defendant nurse's treatment. *Id*. at *22. It was not until the inmate plaintiff presented to the defendant nurse on a fifth occasion with these same symptoms that she ultimately sent him to the emergency room. *Id*. at *10. However, by this time, the inmate plaintiff's appendix had ruptured causing him to develop sepsis, gangrenous bowel, and renal and respiratory failure, and to be hospitalized for two months. *Id.* at *11. After a two-day bench trial, the Court concluded that the defendant nurse was deliberately indifferent to the inmate plaintiff's emergency medical needs because she "ignored the persistency, duration, and severity of complaints," and failed to refer him to a medical provider even "after it became clear that her treatments had failed." *Id*. at *23-24. In the *Rodrigue* case, the court also noted that the plaintiff's expert witness, a physician, testified that "he believed that defendant nurse knew [the plaintiff] faced a substantial likelihood of harm and that she disregarded his complaints." *Id*. at *24 n.7.

Similarly, in *Jimenez*, the inmate plaintiff presented to the jail "sweating profusely, vomiting, and having difficulty standing." 2014 U.S. Dist. LEXIS 3722, at *25. He also reported that he suffered from methicillin-resistant staphylococcus aureus (MRSA), gout, high

blood pressure and rheumatoid arthritis, and that he currently had a staph infection in his groin and a rash of unknown origins. *Id.* The first defendant nurse to see the inmate plaintiff was informed of these symptoms and diagnoses but declined to physically examine him, take his vital signs, or consult with the jail's medical director. *Id.* Plaintiff's nursing expert testified that based upon these conditions, the nurse should have immediately taken the inmate's vital signs and conducted a physical examination to determine whether an immediate referral should have been made to a physician or the emergency department. *Id.* at 28. The second defendant nurse was also informed of Plaintiff's medical condition and diagnoses and was also told that Plaintiff had defecated on himself. *Id.* at 30. With regard to this nurse, the district court stated that, "in the present case, despite reports of multiple occasions of incontinence, hot and swollen joints, and extremely limited mobility . . . [the defendant nurse] conducted no physical exam, did not record the [inmate plaintiff]'s vital signs, and did not contact the physician." *Id.* at 31-32. The inmate plaintiff ultimately died of sepsis. *Id.* at 17. Based on these facts, the district court held that a jury could infer that both of these nurses knew of the inmate plaintiff's serious medical need and disregarded that risk. It then cited *Rodrigue* for the proposition that "[w]hen a gatekeeper to *emergency* care knowingly disregards a prisoner's symptoms, 'she acts with deliberate indifference to that prisoner's medical needs.'" *Id.* at 31-32.

The facts presented in this case in no way resemble the facts presented in either *Rodrigue* or *Jimenez.* Here, Plaintiff presented to McCoy on only one occasion stating that he believed he had either torn or severely strained his left Achilles tendon. McCoy then examined Plaintiff and concluded that he suffered from either a sprain or strain. (DN 186-10, McCoy Aff., ¶ 7). He then advised Plaintiff to rest his ankle, apply ice while awake, compress his left ankle with an

Ace wrap, and elevate his leg to heart-level as much as possible when swelling is present.  (DN 186-8, KDOC Medical Records, p. 5).  McCoy also prescribed Plaintiff 600 mg Ibuprofen for five days and advised Plaintiff to complete another sick call request "if no improvement or increase in pain."  (*Id.*).  Finally, the record shows that McCoy also offered crutches and "gym restrictions" but that Plaintiff stated that they were "not needed."  Thus, unlike the inmate patients in either *Rodrigue* or *Jimenez*, Plaintiff did not present to McCoy with "emergency symptoms."  In addition, the record shows that unlike the defendant nurses in these cases, McCoy examined Plaintiff's injury, offered treatment, and advised him to return to medical if his condition did not improve.

The facts of this case are actually similar to the facts set forth in *Vasquez v. Canfield*, 678 F.Supp. 2d 96 (W.D.N.Y. 2010).  In that case, the court found that although the plaintiff inmate's treating physician had misdiagnosed his ruptured Achilles tendon as a sprain, the physician also ordered x-rays and a medi-wrap of plaintiff's ankle and told plaintiff that he wanted to see him again in one week.  *Id*. at 99.  This same physician continued to see the inmate over the following weeks, but it was not until two months later, when plaintiff saw his physical therapist for a regular appointment, that the physical therapist determined that plaintiff had injured his Achilles tendon.  The physician then referred plaintiff to an orthopedic specialist.  *Id*.  This specialist saw the plaintiff and determined that he had suffered a rupture to his Achilles tendon that required "urgent reconstruction."  *Id*.  The plaintiff ultimately had surgery approximately 3½ months after his initial injury.  *Id.*  The plaintiff claimed that due to the physician's "misdiagnosis," or failure to recognize his serious medical need, he had suffered severe pain for months and had injured his ankle further by exercising it upon the instruction of his physician.

21

*Id.*  The plaintiff also claimed that his surgery was more complicated than it should have been had his condition been diagnosed sooner and that he suffered from permanent muscle deterioration as a result of the delay in correct diagnosis and treatment.  *Id*.  Based on this evidence, the court held that plaintiff had shown no more than negligence.  The court concluded that "[n]o rational finder of fact could conclude that [the physician] deliberately chose to ignore plaintiff's injury out of a desire to inflict unnecessary pain on plaintiff.  Even if a factfinder could reasonably conclude that [the physician] was guilty of malpractice, . . . there is simply no basis upon which to find that he acted with the requisite, culpable state of mind necessary to support an Eighth Amendment claim."  *Id.*

Similarly, in *Adams v. Ingram*, the court held that the triage nurse who first treated the plaintiff for an injury and misdiagnosed his torn Achilles tendon for a sprained ankle was not deliberately indifferent to his medical care, even though she refused to refer him to a doctor despite his repeated requests, because she provided him with treatment – including instructions to elevate his ankle, to use an ice pack and an Ace bandage, to take ibuprofen, and to return in 72 hours for a follow-up visit.  No. 12-cv-162-JPG-SCW, 2015 U.S. Dist. LEXIS 32657, at *3-6 (S.D. Ill. Mar. 17, 2015).  After three visits to the nurse in six days, he was finally seen by another nurse who referred him to a physician.  *Id*. at *5.  The physician diagnosed the plaintiff with a ruptured Achilles tendon and referred him to an orthopedic specialist who surgically repaired the tendon almost two months after it was first injured.  *Id*. at *6-7.  As Plaintiff claims here, because the ruptured Achilles tendon in *Adams* was not treated and/or repaired immediately after it occurred, the plaintiff suffered some permanent damage.  *Id*.  Nonetheless, the court found that the triage nurse was not deliberately indifferent to the plaintiff's serious medical needs

22

because every time he presented himself to her, she examined him and provided him with treatment for his injury.  *Id.* at *9.  The Court concluded:

> There is no evidence that [the triage nurse]'s misdiagnosis of [the plaintiff]'s Achilles tendon injury as a sprain was deliberate indifference, that is that she knew he had a more serious problem than a sprain and that she disregarded the more serious injury.  On the contrary, the evidence shows, at the most, that [the triage nurse] may have committed negligence or malpractice in her diagnosis, and that her treatment for what she honestly believed his condition to be – a sprained ankle – was not "blatantly inappropriate."

*Id*.

Here, the Court finds the reasoning in both *Vasquez* and *Adams* applicable and persuasive.  As in those cases, the Court does not believe a jury could reasonably conclude, based upon the evidence presented, that McCoy committed more than negligence or malpractice in failing to accurately assess Plaintiff's injury or to refer Plaintiff to a medical provider.  Put another way, the Court concludes that the facts presented by Plaintiff regarding his examination and treatment by McCoy show that McCoy was not deliberately indifferent to Plaintiff's serious medical need.[2]

Plaintiff next argues that McCoy failed to follow the standing orders he admittedly utilized during his examination of Plaintiff - - LLCC's standing orders for suspected sprains and strains - - and that this failure also shows that McCoy was deliberately indifferent to Plaintiff's serious medical need.  Plaintiff points out that this standing order directed McCoy to refer an inmate patient to a "provider" if the patient suffered from "gross swelling; severe pain; or ecchymosis, focal or severe tenderness."  Plaintiff then observes that following McCoy's

---

[2] The Court notes that the parties disagree upon whether McCoy "palpated" for a "divot" during his examination of Plaintiff.  According to both parties, this "divot" is a "classic symptom" of an Achilles tendon rupture.  However, the Court finds this disputed fact immaterial, because even if McCoy failed to take this action, no reasonable jury could conclude that this failure elevates his actions from simple negligence to reckless disregard.

assessment of his ankle, McCoy noted that Plaintiff suffered from "moderate edema on medial side of ankle extending rearward to Achilles tendon (diam. R-10" L-11.5")," ecchymosis, and pain on the level of "10/10 if he tries to 'push off' with toes of left foot."  Plaintiff argues that these symptoms indicated that he should have been referred to a provider based the standing order.  (DN 186-8, DOC Medical Records, pp. 2, 5).  Finally, Plaintiff also points to LLCC Policy Number LLCC 13-02-01, titled Access to Healthcare," which states that "Health Care staff shall follow written standing orders."  (DN 192-4, LLCC Policies and Procedures, p. 1).[3]

In response to this argument, the Correctcare Defendants contend that McCoy did not violate LLCC's "standing order" for suspected sprains and strains.  Rather, they argue, the evidence shows that he followed the standing order with regard to treatment by prescribing pain medicine and advising Plaintiff to rest and elevate his leg, apply ice to his injury, and compress it with an "ACE wrap."  They also contend that the record shows that, in accordance with the protocol, McCoy offered Plaintiff crutches and told him to return to medical if "no improvement or increase in pain."  (DN 186-8, KDOC Medical Records, p. 5).  Finally, the Correctcare Defendants point out that the standing order only calls for a referral to a provider if there is "*gross* swelling," "*severe* pain," or "ecchymosis, *focal* or *severe* tenderness."  (DN 192-1, LLCC Standing Orders, p. 7) (emphasis added).  McCoy, however, only noted "*moderate* edema" and "*scant* ecchymosis."  (DN 186-8, KDOC Medical Records, p. 2) (emphasis added).  The Correctcare Defendants also point out that Plaintiff's medical records reflect that McCoy noted no "facial grimacing" and that Plaintiff reported having no pain when he was seated, only

---

[3] The Court notes that the "LLCC Standing Orders" to which Plaintiff cites indicate that they went into effect on November 4, 2011, and LLCC Policy Number 13-02-01 states that it went into effect on January 4, 2016.  However, Defendants make no argument that these orders or policy were not in effect during the time period relevant to Plaintiff's claims.

moderate pain when walking, and severe pain only when he tried to "push off" the toes of his left foot.

Based upon these arguments, the Court finds that whether McCoy followed LLCC's standing order for sprains and strains is a disputed issue of fact – but not one that is material to Plaintiff's claim against McCoy.  A defendant's failure to follow a standing medical order can be considered in determining whether that defendant has shown deliberate indifference.  *See, e.g.*, *Harris v. City of Circleville*, 583 F.3d 356, 369 (6th Cir. 2009) (considering defendant officers' failure to follow an explicit jail policy requiring "all persons involved in use of force incidents who complain of or perceive injuries" to receive medical attention as soon as possible to be circumstantial evidence of deliberate indifference).  However, "failure to follow administrative policies alone does not itself constitute deliberate indifference." *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 407 (6th Cir. 2015).  For example, in *Ward v. Corizon Health, Inc.*, the court held that a nurse's failure to refer an inmate to a medical provider in accordance with a standing order that required such a referral based upon an inmate's symptoms did not constitute a constitutional violation because the plaintiff had not "provided any evidence to suggest that [failure to follow a standing order] amount[ed] to more than mere negligence."  No. 15-cv-11902, 2016 U.S. Dist. LEXIS 104945, at *13-15 (E.D. Mich. July 12, 2016).  Similarly, in *Shaver v. Brimfield Twp.*, the district court held that the defendant jail nurses' failure to properly and timely diagnose the severity of plaintiff's opiate withdrawal (which resulted in his death) and to follow the health provider's protocol for opiate withdrawal "is, at best, evidence of negligence in implementing that protocol."  No. 5:11 CV 154, 2014 U.S. Dist. LEXIS 180571, at *43-44 (N.D Ohio Oct. 31, 2014), *aff'd by* No. 15-3089, 2015 U.S. App. LEXIS 17714 (6th Cir. 2015).

25

The *Shaver* court went on to note that the argument that, "because of the terms of the protocol, the nurses *should* have recognized the true meaning of the symptoms they were noticing, *should* have 'connected the dots' of these symptoms sooner, and so *should have* contacted a physician . . . . is the language of medical malpractice, not deliberate indifference." *Id*. at 44.

Based on this evidence and the above-cited cases, the Court finds that no jury could reasonably conclude that McCoy knew of and recklessly disregarded Plaintiff's serious medical need. Although McCoy assessed Plaintiff's injury as a sprain or strain and may have failed to follow a portion of the standing orders regarding such, he only saw Plaintiff on one occasion, and on this occasion, he examined him, provided appropriate treatment for his injury in accordance with the relevant standing order, and advised Plaintiff to return if his condition did not improve.

Thus, the Court will grant summary judgment in favor of Defendant Nurse McCoy.

### b. Defendant Nurse Owens

With regard to Defendant Nurse Owens, the Correctcare Defendants point out that she too only examined Plaintiff on one occasion - August 11, 2010 - one day after Plaintiff submitted a second sick call slip which stated that he was having difficulty walking and one week after McCoy first saw Plaintiff for his injury. Owens states that she also examined Plaintiff in accordance with LLCC's standing order governing suspected strains and sprains. (DN 186-5, p. 1, Interrog. Answer No. 6). Plaintiff's medical records reflect that Plaintiff told her that he had not been taking his ibuprofen as recommended by McCoy due to minimal pain. (DN 186-8, KDOC Medical Records, p. 11). These same records also show that Owens offered Plaintiff a cane but that he stated that he did not need one. Finally, Plaintiff's medical records indicate that

she forwarded her records to the clinic nurse "for possible [follow-up] with Medical Provider to determine need for further diagnostic review." (*Id.*).

Plaintiff's complaint with regard to Owens is that she recorded in her records that his "pedal pushes" were "strong, equal" and failed to record that he had told her there was a "dent" in his leg. (*Id.*).  In Plaintiff's declaration, he specifically states that Owens "never performed the pedal push procedure, and she never examined my Achilles tendon visually or physically after I told her there was a dent in my leg where a portion of the tendon should be." (DN 192-8, Pl. Decl., ¶ 3).  Plaintiff contends that Owens "maliciously fabricated" her statements that his "pedal pushes" were "strong" and "equal."  Plaintiff also argues that her failure to note his report of an indentation in his leg delayed the correct diagnosis and treatment of his ruptured Achilles tendon.

Contemplating the above-cited cases, considering the facts as a whole, and drawing all reasonable inferences in favor of Plaintiff, the Court holds that no jury could reasonably conclude that Owens recklessly disregarded Plaintiff's serious medical need.  Even if Owens made two incorrect and/or incomplete notes in Plaintiff's medical record, which she denies, the undisputed evidence shows that Owens recorded most of Plaintiff's self-reported symptoms; advised him to continue wearing his ACE wrap, using ice, elevating his leg, and taking his pain medication; offered Plaintiff a cane; and forwarded his records to the LLCC Nurse Services Administrator, for "possible [follow-up] with a Medical Provider."  As with McCoy, the evidence shows, at most, that Owens may have been negligent.

Thus, the Court will also grant summary judgment in favor of Defendant Nurse Owens.

### c. Defendant Nurse Shrock

On September 14, 2010, Plaintiff filed a medical grievance in which he stated that he believed his evaluations by McCoy and Owens had been inadequate and requested an x-ray or MRI to determine the extent of his injury.  On September 16, 2010, Plaintiff was seen by Defendant Nurse Shrock.  In Plaintiff's medical records, she wrote: "IM states that on 7/29/10, IM was playing basketball when he heard a loud 'pop' at the Achilles site. . . . .  He states that his ankle swelled and he could not put any pressure on the ball of his foot.  He states that he now compensates for the injury & it puts more strain on his hips & back.  He has been wearing an ankle brace & putting ice on the site in the evenings, visible & palpable indention at L Achilles + planatar flexion."  (DN 186-8, KDOC Medical Records, p. 15).  Based on this information, Shrock assessed Plaintiff to have an "achilles rupture" and requested a left foot x-ray "to rule out an avulsion fracture at the tendon insertion site" and an MRI.  (*Id.* at p. 16).

On September 23, 2010, Plaintiff received an x-ray.  This x-ray showed no fracture or dislocation and that Plaintiff's left foot was "intact, free of trauma, or other abnormally."  (*Id.* at p. 19).  On this same date, Correctcare authorized an MRI for Plaintiff to be scheduled between "9/23/10-11/22/10."  (*Id.* at p. 20).

Plaintiff's medical records reflect that he received an MRI at Baptist Hospital Northeast on October 12, 2010.  The MRI showed that Plaintiff had a "complete mid-Achilles tendon rupture."  (*Id.* at p. 25).  The records then show that Shrock requested an "ortho consultation" for Plaintiff on October 18, 2010.  (*Id.* at p. 26).  This request was faxed to Correctcare on October 29, 2010.  Instead of approving the request, Correctcare requested more clinical information

stating: "Is he ambulatory?  What is his gait?  Can he walk on his toes? Where is his pain?"  (*Id.* at p. 30).

On November 5, 2010, Shrock responded to Correctcare's request for more information. She wrote: "Pt is ambulatory with a cane only, he cannot weight bear, *he can only walk on toes*, pain is in L heel/foot, It has become increasingly difficult to ambulate.  IM states 'feels like standing on one when barefoot.'"  (DN 186-12, Correctcare Authorization Request, p. 4) (emphasis added).  On the same day, a second request for authorization for an "ortho consult" was returned from Correctcare with a request for still more information.  The form stated: "MRI results are inconsistent w/ pts symptoms.  Need more information re: how pt. is ambulating.  Ability to walk on toes is inconsistent w/ an Achilles tendon rupture.  Perhaps observation of IM's ambulation when he is unware he is being watched."  (DN 186-8, KDOC Medical Records, p. 32).  On November 8, 2010, this additional information was submitted to Correctcare by Shrock: "Inmate was brought to exam room today.  He was observed walking without cane.  He ambulates R heel-toe, L heel, R heel-toe.  He states he cannot walk for long periods of time.  He cannot bear any weight on ball of L foot."  (*Id.*).

On November 9, 2010, Correctcare approved Shrock's request for an "ortho consult." The consult was to be scheduled between October 29 and December, 28, 2010.  On November 18, 2010, Shrock faxed another authorization request to Correctcare captioned "Providers Request Consultation (Achilles tend sx-URGENT)."  (*Id.* at p. 45.).  The authorization request stated: "per Dr. Jacob's recommendations, wants to perform surgery on 11-19-10."  This request was approved by Correctcare, and Dr. Jacob performed surgery on November 19, 2010, to repair Plaintiff's Achilles tendon.

Approximately one year later, on November 27, 2011, Plaintiff submitted a sick call request to the LLCC medical department stating that he believed he had "strained" his "repaired [Achilles] tendon."  He also stated that he wanted "to know what can be done to allow me to be able to regain full function of the repaired tendon as I was told by Dr. Jacob."  At the end of his request, he stated: "Requested Follow up with surgeon and new MRI."  (*Id*. at p. 86).  Based upon this sick call request, on November 29, 2011, Shrock requested a consultation with Dr. Jacob and an MRI for Plaintiff.  This request was submitted to Correctcare on December 2, 2011.  Correctcare ordered that the request be resubmitted after Plaintiff's parole hearing which was scheduled for December 11, 2011. (*Id.* at 91).  On January 4, 2012, Correctcare approved the request for another MRI, and it was conducted on January 27, 2012.  This MRI showed that Plaintiff had a re-tear of his Achilles tendon.  On January 30, 2012, Shrock ordered that Plaintiff be given a boot and bottom bunk for six months due to an "Achilles tendon retear."  (*Id*. at p. 98).

With regard to his initial injury, Plaintiff seems to argue that Shrock was deliberately indifferent to his serious medical need because she waited four days after learning that an MRI had confirmed her diagnosis of a ruptured Achilles tendon to send a request to Correctcare for an orthopedic consultation.  Plaintiff also faults Shrock for waiting one full week before providing Correctcare with the additional information it requested on October 29, 2010.  He then states that Shrock deliberately provided false information to Correctcare by stating that he could "only walk on toes."  He also criticizes Shrock for calling him in for another examination to see if he could walk on his toes because, according to Plaintiff, Shrock already knew that he could not.  Plaintiff

claims this additional unnecessary examination resulted in an additional four-day delay in Correctcare actually approving Shrock's request for an "ortho consult."

With regard to the re-injury of his Achilles tendon, Plaintiff argues that Shrock was deliberately indifferent to his serious medical by not examining or treating him after he submitted the sick call request on November 27, 2011, requesting to be seen by his surgeon. Even though Shrock requested an MRI for Plaintiff and a consultation with Dr. Jacob based on the explicit language of his sick call request, Plaintiff argues that her failure to see him after he submitted this requested violated "LLCC medical policy" which "mandates that a healthcare professional shall call an inmate requesting routine medical care to medical to address his medical need." Plaintiff contends that Shrock could have provided treatment for him prior to January 30, 2012, when she gave him a fracture boot due after an MRI confirmed that he had retorn his Achilles tendon.

The Correctcare Defendants argue that Shrock is entitled to summary judgment because the records show that she is the one who accurately diagnosed Plaintiff's initial injury and then appropriately requested both an x-ray and an MRI in 2010. They further argue that once an MRI confirmed Plaintiff's initial Achilles tendon rupture, it was Shrock who made a request for a surgical consult and then provided additional information to Correctcare to make sure the request was approved. With regard to Plaintiff's belief that Shrock should have examined him after he submitted the sick call request in November 2011, the Correctcare Defendants note that Shrock was simply complying with what Plaintiff had requested in the sick call request itself and that, if Plaintiff had desired an examination or treatment by an LLCC medical staff person at that time, he could simply have submitted another sick call request stating such.

31

Based upon this evidence and the above-cited cases, the Court holds that, as with Defendant Nurses McCoy and Owens, no rational finder of fact could conclude that Shrock was deliberately indifferent to Plaintiff's injury.  The Court does not believe that any reasonable juror could conclude that Shrock's six-worded misstatement that "[Plaintiff] can only walk on toes" was anything more than a mistake in light of the fact that it was Shrock who correctly diagnosed his injury, ordered an x-ray and MRI to confirm her diagnosis, requested an orthopedic consult, and responded to Correctcare's multiple requests for additional information until her request for a consult was approved.  The Court is also not persuaded that a reasonably jury could conclude that Shrock's failure to examine Plaintiff after he submitted a sick call request to see his surgeon constituted deliberate indifference to a serious medical need, even though it may have been a technical violation of LLCC policy, since she requested authorization for an MRI and an orthopedic consultation based upon this sick call request.

The Court, therefore, will grant summary judgment in favor of Defendant Nurse Shrock on this claim.

### d. Defendant Dr. Crall

Plaintiff's only claim against KDOC Defendant Dr. Crall is that Dr. Crall "encouraged adherence to Correctcare's policies to save costs and increase profits" by denying Plaintiff's appeal of the Healthcare Grievance Committee's decision that Plaintiff's medical records should not be altered despite Plaintiff's claim that they had been falsified by Nurse Owens.

In the KDOC Defendants' renewed motion for summary judgment, they argue that this action by Dr. Crall is insufficient to establish that he was deliberately indifferent to Plaintiff's serious medical needs.  In Plaintiff's response to this motion, he states that he agrees that Dr.

32

Crall "is entitled to summary judgment on the claims asserted against him in the complaint." (DN 192, p.1, n.1).

Here, the Court agrees with both parties that there is no genuine dispute of material fact and that Dr. Crall is entitled to summary judgment as a matter of law.[4]  This is because Plaintiff initially sought to impose liability on Dr. Crall for denying Plaintiff's appeal of a grievance. Prison officials, however, cannot be liable for denying a prisoner's administrative grievance or failing to intervene on a prisoner's behalf.  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

### e. Defendant Correctcare

Plaintiff states that Defendant Correctcare has three customs and one policy which deprived him of his constitutional right to adequate medical care under the Eighth Amendment. He first complains that Correctcare "has a custom of saving costs and increasing profits by directing prison nurses to provide less expensive and less efficacious treatment to serious but non-life threatening medical conditions; instead of requesting referrals to the institutional provider for services from medical specialists."  (DN 1, Verified Compl., ¶ 184).  Plaintiff also argues that Correctcare:

> has a custom of saving cost and increasing profits by directing prison nurses to provide material misrepresentations in the medical records of prisoners who have serious but non-threatening injuries in order to belie the seriousness of those injuries; disregard subjective symptoms in order to belie the seriousness of the injuries; and then refer those records to the institutional provider with the knowledge that further treatment will be deemed unnecessary.

---

[4]  The Sixth Circuit has held that "even where a motion for summary judgment is unopposed, a district court must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists."  *FTC v. E.M.A., Inc.*, 767 F.3d 611, 630 (6th Cir. 2014).

(DN 1, Verified Compl., ¶ 185).  Plaintiff further contends that Correctcare "has a custom of not providing diagnosis and treatment for serious but non-life threatening medical conditions until compelled to do so by prisoners filing grievances and complaints."  (DN 1, Verified Compl., ¶ 186).  The Correctcare "policy" which Plaintiff argues is unconstitutional is the one Correctcare supposedly followed by ordering Shrock to resubmit her December 2, 2011, request for Plaintiff to have an MRI after Plaintiff's scheduled December 11, 2011, parole hearing.  (DN 94-1, Supp. Comp., ¶ 5).

Finally, Plaintiff argues that Correctcare violated his Eighth Amendment rights by not having a "process for the timely processing of requests for diagnostic and/or treatment services for serious but non-life threatening medical issues."  (DN 1, Verified Compl., ¶ 187).  With regard to this claim, Plaintiff argues that Correctcare should be liable because it has no policies governing Achilles tendon ruptures and because it fails "to timely process requests for diagnostic and/or treatment services for serious but non-life threatening medical issues."  Plaintiff also cites to cases which indicate that other prison medical care providers have a specific treatment protocol for Achilles tendon ruptures that includes "splint, crutches, . . . and [making] an 'urgent' referral for further treatment."  *See, e.g.*, *Petties v. Carter*, 795 F.3d 688, 693 (7th Cir. 2015).  He also points out that Nurse Shrock stated that "it took a long time to get surgical intervention for an Achilles tendon rupture.  But that is about average for non-life threatening illnesses."  (DN 192-18, p. 4).  Finally, Plaintiff recounts how it took Correctcare ten days to review Nurse Shrock's initial request for an MRI and then, how after it received the additional requested information from Nurse Shrock, it took Correctcare another eight days to approve her request.

34

To establish § 1983 liability against a corporation, whether public or private, a plaintiff must show that the defendant implemented a policy, custom, or practice that caused a deprivation of the Plaintiff's Eighth Amendment rights.[5]  *Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001).  Thus, in order to state a § 1983 claim against Correctcare, Plaintiff "must allege the existence of a policy, practice or custom that resulted in the injury."  *Moreno v. Metro. Gen. Hosp.*, No. 99-5205, 2000 U.S. App. LEXIS 5876, at *2 (6th Cir. 2000).  A custom or practice is an acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity.  *See Highfill v. City of Memphis*, 425 F. App'x 470, 476 (6th Cir. 2011).  Put another way, a custom is defined as a "relevant practice" that has not been approved by an appropriate decision-maker but is "so widespread as to have the force of law."  *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690-91 (1970).

The Sixth Circuit has specifically held that "there can be no *Monell* municipal liability under §1983 unless there is an underlying unconstitutional act."  *Henderson v. Reyda*, 192 F. App'x 392, 398 (6th Cir. 2006) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). *See also S.L. v. Pierce, Twp. Bd. of. Trs.*, 771 F.3d 956, 963 (6th Cir. 2014) (holding that "an attempt to impose municipal liability under § 1983 requires and underlying violation of the § 1983 claimant's rights"); *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2005) ("In fact, because the jury found no constitutional violation . . . the county could not have been found liable. . . for an allegedly unconstitutional custom or policy."); *Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002) ("Where, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees

---

[5] Defendant Correctcare is treated as a municipality for purposes of liability under § 1983 because *Monell*'s holding extends to private corporations as well.  *See Street v. Corr. Corp. of Am.*, 102 F.3d 810, 817-18 (6th Cir. 1996).

inflicted a constitutional harm."); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir.
2001) ("If no constitutional violation by the individual defendants is established, the municipal
defendants cannot be held liable under § 1983.").

Thus, despite Plaintiff's arguments, his claims against Correctcare for having customs or
policies that have resulted in violation of his Eighth Amendment rights fail because the Court has
already determined that no reasonable jury could conclude that any individual Correctcare
Defendant violated Plaintiff's Eighth Amendment rights.

In addition, with respect to Plaintiff's claim that Correctcare does not have a process for
the timely processing of requests for diagnostic and/or treatment services for serious but non-life
threatening medical issues, the Court also looks to *Modd v. Cty. of Ottowa*, No. 1:10-cv-337,
2012 U.S. Dist. LEXIS 158610, at *57 (W.D. Mich. Aug. 24, 2012).  In that case, the district
court specifically addressed whether a corporate defendant could be liable for a delay in treating
the Plaintiff's serious medical needs, where there was no finding that some individual defendant
was deliberately indifferent.  The *Modd* court relied upon the cases cited above and noted that a
delay in providing treatment could be, depending on the facts, "innocent, negligent, deliberately
indifferent, or malicious and intentional."  *Id*.  It continued: "In the first two circumstances, no
constitutional violation occurs; in the latter two circumstances, the denial of medical care reaches
constitutional proportions.  This is all a long way of saying that the finding of a constitutional
violation requires not only an objective component but also a 'subjective' component of
deliberate indifference."  *Id*.  Thus, the *Modd* court held that because it had found that no
particular employee was deliberately indifferent in causing the delay experienced by the plaintiff,
the corporate defendant could not be held liable either.

36

In light of these cases, this Court holds that Correctcare cannot be held liable under § 1983 and, as such, will grant summary judgment in its favor.[6]

## B.  Retaliation

Plaintiff makes First Amendment retaliation claims against Correctcare Defendants Nurse Mullins and Nurse Shrock, and KDOC Defendant Rhonda Coleman.

The Sixth Circuit has held that:

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  The plaintiff has the burden of proof regarding all three elements.  *See, e.g.*, *Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003); *Green v. Tudor*, 685 F. Supp. 2d 678, 692 (W.D. Mich. 2010).  Moreover, the plaintiff must prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).  If the plaintiff makes such a showing, the defendants may still avoid liability by showing "that [they] would have taken the same action in the absence of the protected activity."  *Whiteside v. Parrish*,

---

[6] In Plaintiff's supplemental complaint, he also made claims that "Defendants" were deliberately indifferent to his serious medical need and retaliated against him by failing to provide him with a bottom bunk after he sent a letter requesting such on September 8, 2011.  (DN 94-1, Supp. Compl., ¶¶ 19-22).  However, Plaintiff fails to specify which "Defendants" allegedly engaged in this action.  In addition, the Correctcare Defendants argue that these claims must fail because Plaintiff failed to exhaust his administrative remedies by filing a grievance regarding this letter.  Plaintiff does not dispute this argument.  Thus, the Court agrees that the Correctcare Defendants are entitled to summary judgment on these claims.

387 F. App'x 608, 612 (6th Cir. 2010) (quoting *Thaddeus-X*, 175 F.3d at 399); *Jones v. Smolinski*, No. 1:09-CV-633, 2010 U.S. Dist. LEXIS 143638 (W.D. Mich. Aug. 31, 2010).

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence.  *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (C.D. Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985).  "[A]lleging merely the ultimate fact of retaliation is insufficient."  *Murphy*, 833 F.2d at 108.  "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)).

### 1. Defendant Nurses Mullins and Shrock

Plaintiff claims that Defendants Nurses Mullins and Shrock retaliated against him for filing grievances related to his medical treatment.  He specifically claims that Mullins retaliated against him by issuing him two disciplinary write-ups that were subsequently dismissed and by refusing to allow him to use a wheelchair and that Shrock retaliated against him by placing him in the SMU – or segregation.[7]

As discussed above, the record shows that Plaintiff filed grievances against the medical staff regarding the care he was receiving for his injury on September 13, October 5, and November 11, 2010, and that Plaintiff ultimately had surgery to repair his ruptured Achilles tendon on November 19, 2010.  According to Plaintiff, on November 17, 2010, he filed another

---

[7] Plaintiff initially claimed that Shrock retaliated against him by transferring him to KSR in March 2011, but in his response to the Correctcare Defendants' motion for summary judgment, he states that he agrees that Shrock is entitled to summary judgment on this claim.  (DN 192, p. 83 n.19).

grievance in which complained that his medical records had been fabricated.  (DN 1, Verified

Compl. ¶¶ 67-68).  However, when Plaintiff filed this last grievance, he was told by the

grievance coordinator that "medical records were non-grievable" and that he would be "tagged"

if he persisted in filing the grievance.  (*Id*. at ¶ 72).  Plaintiff understood this to mean that he

would be subjected to retaliatory treatment if he persisted in filing the grievance.  (*Id.*).

On November 23, 2010, a correctional officer retrieved a wheelchair for Plaintiff to use

"to go to medical and to receive his morning shot" and then told another inmate to wheel

Plaintiff to medical.  The correctional officer "was advised by the compound supervisor to due

[sic] so because of the snow and ice on the ground."  (DN 192-15, p. 2).  However, when

Plaintiff arrived to get his shot, Mullins issued Plaintiff a disciplinary write-up for using a

wheelchair because Shrock had supposedly informed him that he could not have a wheelchair.

(*Id*. at p. 1).  The investigating officer determined that the write-up should be dismissed since "it

was security staff that went and got the wheelchair and not the inmate."  (*Id*. at p. 2).

On November 24, 2010, Mullins issued Plaintiff another disciplinary write-up.  This one

was "for failing to appear at a medical appointment."  In the write-up, she reported that she had

received a call from a correctional officer stating that Plaintiff "was hurt and broken and if we

wanted him to come to medical then we would have to come to the dorm with a wheelchair and

pick him up."  Both parties agree that this write-up was also subsequently dismissed.

However, according to Plaintiff, on this same day, Shrock directed that Plaintiff be

wheeled by another inmate into the SMU – or segregation.  Plaintiff states that he was placed in

segregation for five days and required to "crutch" to medical "secured with a waist belt that was

chained to his hands, and leg restrains which were chained to his crutches" to receive his shots.[8]

The filing of a prison grievance is constitutionally protected conduct for which a prisoner

cannot be subjected to retaliation.  *See Smith v. Campbell*, 250 F.3d at 1037; *Hall v. Nusholtz*,

No. 99-2442, 2000 U.S. App. LEXIS 28002, 2000 WL 1679458, at *2 (6th Cir. Nov. 1,

2000); *Burton v. Rowley*, No. 00-1144, 2000 U.S. App. LEXIS 28000, 2000 WL 1679463, at *2

(6th Cir. Nov. 1, 2000).

The next element of retaliation which Plaintiff must prove is "adverse action."  As a

general rule, "[w]hether an alleged adverse action is sufficient to deter a person of ordinary

firmness is generally a question of fact."  *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583-84

(6th Cir. 2012) (citing *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002)).  In addition, the Sixth

Circuit has never required that an individual plaintiff actually be chilled in the exercise of

his First Amendment rights to succeed on a retaliation claim.  *Center for Bio-Ethical Reform,

Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007).  Finally, the Sixth Circuit has held

that "all that is required to reach a jury on the issue of whether the retaliatory actions could deter

a person of ordinary firmness from engaging protected conduct" is "evidence . . . sufficient to

demonstrate that the claimed retaliatory acts were not merely *de minimis* acts of harassment."

*Bell*, 308 F.3d at 606-07.

There is sufficient evidence in this record to establish the adverse action element of the

Plaintiff's claim.  This is especially so since the Sixth Circuit has held that charging an inmate

with misconduct "is an adverse action because serious consequences can flow from erroneous

---

[8] Shrock states that she only placed Plaintiff in the SMU for two days.  (DN 186-14, Shrock Aff., ¶ 9).

charges," even "when the charges are subsequently determined to be unfounded . . . ." *King v. Zamiara*, 150 F. App'x 485, 493-94 (6th Cir. 2005). *See also Scott v. Churchill*, No. 97-2061, 2000 U.S. App. LEXIS 6714, at *6 (6th Cir. Apr. 6, 2000) ("[T]he filing of a false misconduct report could deter a person of ordinary firmness from exercising his First Amendment rights."); *Catanzaro v. Mich. Dep't of Corr.*, No. 1:09 CV 2, 2011 U.S. Dist. LEXIS 152543, at *28-29 (W.D. Mich. Dec. 16, 2011) (allowing retaliation claim to go to jury where adverse action involved defendant charging plaintiff with a misconduct violation for having three highlighter markers in his possession even though charge was never heard and no sanction was imposed); *Campbell v. Gause*, No. 10-111371, 2011 U.S. Dist. LEXIS 21870, at *21 (E.D. Mich. Feb. 1, 2011) (recognizing that whether the issuance of a minor misconduct ticket could constitute an adverse action is "a question of fact" for the jury).

In addition, the Sixth Circuit has also held that placing an inmate in administrative segregation can be sufficient to constitute an adverse action. *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010). Thus, although Plaintiff and Shrock disagree over the number of days Plaintiff was placed in the SMU, this is a fact which the jury can decide and weigh in determining whether Shrock's action was more than a *de minimus* act of harassment.

The final element that Plaintiff must prove is causation, or that Mullins and Shrock were motivated, at in least in part, by Plaintiff's protected conduct. Mullins has stated that she filed Plaintiff's first disciplinary report because he had "commandeered a wheelchair from the medical department" and the second disciplinary report because "he failed to report to medical for his injections." (DN 196-4, Mullins Answer First Set of Interrog., Nos. 5 and 11). However, Mullins also admits that, in regard to her second write-up, "with the exception of a life

41

threatening situation where an inmate is incapable of providing consent, an inmate may refuse medical treatment at any time." (*Id*. at No. 5). In addition, Shrock has averred that she ordered that Plaintiff be placed in the SMU "to make it easier for him to report for his medical injections." (DN 186-14, Shrock Aff., ¶ 7).

Although Defendants' explanations for their actions may ultimately persuade a jury that their actions were taken for legitimate, non-retaliatory reasons, the Court concludes that Plaintiff has set forth facts from which a reasonable jury could conclude otherwise. These facts include the severe tone of the grievance Plaintiff filed on November 11, 2010, which included allegations that medical staff deliberately falsified Plaintiff's medical records; Mullins's and Shrock's knowledge of this grievance; the fact that the first two write-ups issued by Mullins were ultimately dismissed; and the temporal proximity between the filing of Plaintiff's grievances and his two disciplinary write-ups and placement in segregation.

The Correctcare Defendants next argue that Plaintiff's retaliation claims against Mullins and Shrock fails because Plaintiff did not exhaust his administrative remedies with regard to these claims. Pursuant to 42 U.S.C. § 1997e(a), a prisoner asserting an action with respect to prison conditions must first exhaust all available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002). Prisoners are no longer required to demonstrate exhaustion in their complaints. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Instead, failure to exhaust administrative remedies is "an affirmative defense under the PLRA" which the defendant bears the burden of establishing. *Id.* With respect to what constitutes exhaustion, the Supreme Court has stated that "the PLRA exhaustion requirement requires proper exhaustion" defined as

"compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90-93 (2006). In *Bock*, the Court reiterated as follows:

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

549 U.S. at 218.

Plaintiff argues that the Correctcare Defendants' exhaustion arguments with regard to both Mullins's disciplinary write-ups and Schrock's placement of him in the SMU fail because KDOC policy lists disciplinary procedures as "non-grievable." The Correctcare Defendants do not seem to dispute this point. Rather, they argue that these actions were not disciplinary in nature, but fell under the categories of "personal action by a staff, staff conflicts, or a medical concern," all of which, according to the Correctcare Defendants, "are clearly grievable under CPP 14.3.II. B." (DN 195-1, Correctcare Defs.' Reply, pp. 15-16).

The Court finds that Mullins's actions were clearly disciplinary in nature and, thus, non-grievable under KDOC policy. With regard to Schrock's placement of Plaintiff in the SMU, the Court believes that the Correctcare Defendants' argument that it was not disciplinary in nature, but medical, goes to the underlying dispute between the parties about what motivated Schrock's decision to place him there – that is, whether he was placed there by Schrock to punish him or because the SMU was closer to the medical department, where Plaintiff had to go to receive his post-surgical injections. Thus, the Court believes that this is an issue that must be resolved by a jury.

For these reasons, the Court will deny the Correctcare Defendants' motion for summary judgment on the retaliation claims against Defendant Nurses Mullins and Shrock.

### 2. Defendant Coleman

Defendant Rhonda Coleman was a KDOC employee assigned to the LLCC medical department.  Plaintiff claims that she retaliated against him for filing grievances and open records requests for his medical records.  The KDOC Defendants do not dispute that both of these actions constitute protected activity under the First Amendment.  Rather, they argue that Plaintiff cannot establish that his transfer to KSR for physical therapy was an adverse action or that it was motivated by his protected conduct.

Plaintiff states that between November 2010 and March 2011, he initiated several open records requests to the LLCC medical department.  (DN 1, Verified Compl., ¶ 148).  On March 4, 2011, Plaintiff sent Coleman a letter stating that her response to his records request was deficient.  On March 11, 2011, Plaintiff appealed Coleman's response to his open records request for medical records to the Kentucky Attorney General.  On March 15, 2011, Coleman ordered that Plaintiff be transferred to KSR.

Plaintiff states that on February 22, 2011, he sent a letter to the LLCC medical department specifically requesting that he be consulted prior to any transfer to KSR since he had the right to refuse treatment, including physical therapy for his surgically repaired Achilles tendon.  In the letter, Plaintiff stated that he did not want to be transferred because he wanted to complete the sex offender treatment program he was enrolled in at LLCC.

Plaintiff's medical records show that on March 2, 2011, his cast was removed by Dr. Jacob.  (DN 186-8, KDOC Medical Records, p. 63).  Dr. Jacob then wrote the following:

"PLAN:  The facility needs to place him into a fracture boot that he can remove to begin active range of motion exercises of the ankle.  He needs daily physical therapy or at least 3 days a week for heat, e-stim and active assisted range of motion.  Return to see me in 4 weeks.  Will then allow weight bearing in the fracture boot.  No x-rays necessary."  (*Id*. at p. 64).  On March 8, 2011, Plaintiff was seen by a physical therapist at KSR before he was transferred there, and this physical therapist noted: "We do not need to see him again as he can perform his own program. Due to his ankle already having good ROM he can get by without the moist heat and Estim.  We can wait to see him again until after he sees Dr. Jacob and his program is ready to be advanced." (*Id*. at p.68).

Coleman states that she initiated Plaintiff's transfer from LLCC to KSR "due to the physical therapy order from Dr. Jacobs dated March 2, 2011."  (DN 192-22, Response to Plaintiff's Interrog. No. 3).  She states that because frequent transfer to KSR would have been required based upon the order for physical therapy, a "turnaround movement was requested to KSR to eliminate transportation."  (*Id*.).  Plaintiff states that despite the KSR physical therapist finding that he did not need to be transferred to KSR for physical therapy, Coleman ordered the transfer anyway.  He further states that while he was at KSR, he was "placed in the Nursing Care Dorm with terminally ill prisoners and prisoners with serious diseases" and that "he was not allowed in the general population . . . was restricted to his dorm wing, and had no access to legal materials."  (DN 1, Verified Compl., ¶ 152).[9]  Plaintiff further states that on March 22, 2011, the physical therapist came to the nursing care dorm at KSR and asked him what he was doing there.

---

[9] Although Plaintiff also states in his response to the motions for summary judgment that, as a result of this transfer, he lost his job as a legal aide and his placement in a court-ordered sex-offender treatment program at LLCC, the Court can find no evidence in the record to support these assertions.

She specifically told him that she had not changed her recommendations.  (DN 1, Verified Compl., ¶¶ 154-155).  Plaintiff was returned to the general population at LLCC on April 15, 2011.

Based on these facts, the Court cannot agree that Coleman is entitled to judgment as a matter of law.  Generally, inmates have no inherent constitutional right to avoid transfer from one prison to another.  *Olim v. Wakinekona*, 461 U.S. 238, 245-46 (1983).  However, the Sixth Circuit has held that, despite this general principle, prison officials may not transfer a prisoner as a means of retaliating against him for exercising his First Amendment rights."  *Hill v. Lappin*, 630 F.3d at 473.  In *Hill*, the Sixth Circuit noted that prison transfers can constitute adverse action where the transfer "would result in foreseeable, negative consequences to the particular prisoner."  *Id*. at 475 (citing *Siggers-El v. Barlow*, 412 F.3d 693, 701-02 (6th Cir. 2005)).  Here, Plaintiff was not only transferred to another facility, the evidence indicates that he was placed in a restricted ward at KSR in which he arguably did not belong, where he did not actually receive any physical therapy, and where he lost access to his legal materials.  Coleman does not dispute any of these facts.

Coleman argues that there is no evidence that her decision to transfer Plaintiff was motivated by the filing of his grievances and open record requests since she was not the subject of his grievances.  However, Plaintiff states that his transfer to KSR occurred after Coleman had twice withheld information she was required to provide in response to his open records request for his medical records and less than two weeks after he wrote a letter to Coleman regarding her incomplete response.  Again, Coleman does not dispute any of these facts.  And although Coleman indicates that she transferred Plaintiff to KSR based upon his physician's orders for

46

physical therapy, she does not explain why she transferred him to KSR after KSR's physical therapist indicated that placement at KSR was not necessary for his physical therapy treatment plan.

Finally, Coleman asserts that she is entitled to qualified immunity based upon her decision to transfer Plaintiff to KSR.  However, in *Siggers-El v. Barlow*, the Sixth Circuit held that a reasonable officer would know that a retaliatory transfer for a prisoner's exercise of his First Amendment rights would deter a person of ordinary firmness from continuing to engage in this protected conduct.  412 F.3d at 703.  The Court then concluded that since the defendant "knew or should have known of the constitutionally violative effect of his actions," he is not entitled to qualified immunity as a matter of law.  *Id.*  The Court believes that the facts presented by Plaintiff support his claim of a retaliatory transfer, with a purpose, at least in part, of interfering with his First Amendment rights.  Thus, the Court concludes that Coleman is not entitled to qualified immunity.

Based upon the above discussion, the Court will deny Coleman's motion for summary judgment as to Plaintiff's retaliation claim against her.

## C.  Conspiracy

Plaintiff's final claim is that Defendants Nurse Owens, Nurse Shrock, and Coleman engaged in a civil conspiracy under § 1983.  "A civil conspiracy under § 1983 . . . is 'an agreement between two or more persons to injure another by unlawful action.'"  *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th. Cir. 2011) (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007)).  A plaintiff must show that (1) a "single plan" existed; (2) defendants "shared in the general conspiratorial objective" to deprive the plaintiff of his constitutional rights; and (3) "an

overt act was committed in furtherance of the conspiracy that caused [the plaintiff's] injury." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).

Plaintiff claims that, "[i]n the simplest terms, the illegal plan here was to save money and reduce costs by fabricating records and ignoring symptoms to belie the existence of Plaintiff's Achilles tendon rupture in violation of the Eighth Amendment."  He then states that, in furtherance of this conspiracy, Shrock and Owens fabricated his medical records and Coleman withheld Shrock's "fabricated medical record" from him despite three requests pursuant to the Kentucky Open Records Act.

However, as the Correctcare Defendants rightfully point out, "to prevail on a § 1983 civil conspiracy claim, the plaintiff must show an underlying constitutional violation."  *Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 462 (6th Cir. 2011).  The underlying constitutional violation which Plaintiff claims here is deliberate indifference to his serious medical need in violation of the Eighth Amendment.  Thus, because this Court has concluded that Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claims, his civil conspiracy claim necessarily fails.

Accordingly, the Court will grant summary judgment in favor of Defendants Nurse Owens, Nurse Shrock, and Coleman on Plaintiff's conspiracy claims against them.

## VI. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's motion for an extension of time to file his response (DN 191); Plaintiff's motion to exceed the response memorandum page limit (DN 194); the Correctcare Defendants' motion to exceed the reply

memorandum page limit (DN 195); and Plaintiff's motion to file a sur-reply (DN 197) are

**GRANTED.**

> **IT IS FURTHER ORDERED** that Plaintiff's motion to strike the KDOC Defendants'

reply (DN 199) is **DENIED.**

> **IT IS FURTHER ORDERED** that the motions for summary judgment (DNs 162 &

186) are **GRANTED** in part and **DENIED** in part, as follows:

> (1) summary judgment is **GRANTED** in favor of KDOC Defendant Doug Crall, M.D.,
>
> and Correctcare Defendants Nurse McCoy, Nurse Owens, Nurse Shrock, and
>
> Correctcare with regard to Plaintiff's Eighth Amendment claim of deliberate
>
> indifference to a serious medical need;

> (2) summary judgment is **GRANTED** in favor of Correctcare Defendants Nurse Owens
>
> and Nurse Shrock and KDOC Defendant Coleman with regard to Plaintiff's 42
>
> U.S.C. § 1983 conspiracy claim; and

> (3) summary judgment is **DENIED** as to Plaintiff's retaliation claims against Correctcare
>
> Defendants Nurse Mullins and Nurse Shrock and KDOC Defendant Coleman.

Date:  November 29, 2016


**David J. Hale, Judge**
**United States District Court**


cc:     Plaintiff, *pro se*
        Counsel of Record
4415.011